**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| JBG SMITH PROPERTIES, LP FIRST RESIDENCES | * * * | JURY DEMANDED. |
| Plaintiff, | * * | |
| v. | * * | Case: 2023-LTB-007524 (Removed) *D.C. Superior Cour*t |
| JORDAN POWELL | * * * | Case: 1:24–cv–03215 JURY DEMAND Assigned To : Unassigned Assign. Date : 11/4/2024 Description: Pro Se Gen. Civ. (F–DECK) |
| Defendant, Third-Party Plaintiff, | * * | Case no.: _____ |
| v. | * * | |
| THE UNITED STATES SMALL BUSINESS ADMINISTRATION | * * * | |
| Third-Party Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## THIRD-PARTY COMPLAINT

Defendant/Third-Party Plaintiff brings this Third-Party Complaint against the United States Small Business Administration (SBA) pursuant to Fed. R. Civ. P. 14(a), 12(h)(2)(A), and 7(a)(5).

## JURISDICTION

1.      This court has jurisdiction pursuant to 15 U.S.C. § 634 (see 5 U.S.C. § 702, 706); 28 U.S.C. § 1331, 1343, 1442, 1443; 42 U.S.C. 1981, 1982, 1983, 1985, 1986 and 1988. Third-Party Plaintiff has standing as as real party in interest under Fed. R. Civ. P. 17(a) and Article III Administrative Procedure Act (APA) standing within the *zone of interests* Congress sought to protect. The Plaintiff may also have Article III Administrative Procedure Act (APA) standing within the *zone of interests* Congress sought to protect.

1

RECEIVED

NOV 11 2024

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

## **FACTS**

2.    Due to the SBA's unlawfully withheld and unreasonably delayed action, arbitrary and capricious abuse of discretion contrary to constitutional right, in excess of statutory authority, and without observance of procedure required by law concerning an economic injury disaster loan, Defendant/Third-Party Plaintiff  became, as a result, unable to meet the obligations of the tenancy agreement existing between the Plaintiff and the Defendant/Third-Party Plaintiff. Defendant/Third-Party Plaintiff asserts against the Third-Party Defendant a claim that arose out of the October 14, 2020 lease transaction and the failure to pay rent occurrence where the Third-Party Defendant's economic injury to realized income from Pricecheck Inc. was part of the basis for the lease agreement where such terms were not achievable due to the Third-Party Defendant's fairly traceable failure which is clearly  the cause of the Plaintiff's action. All other injuries set forth in the November 4, 2024 notice of removal of this case are incorporated by reference here. Granting the relief requested will relieve both the Plaintiff and Third-Party Plaintiff of each of their respective injuries.

3.    On May 13, 2020 Pricecheck Inc. (hereinafter "the Company") applied for an Economic Injury Disaster Loan (EIDL). SBA made a loan offer to the Company June 16, 2020, and Third-Party Plaintiff, as substantial majority owner and real party in interest here[1], signed the loan agreement on behalf of Pricecheck Inc. on June 19, 2020.

---

1   "As long as the plaintiff is a *bona fide* real party in interest, "Rule 17(a) does not require the addition of other parties also fitting that description." *HB Gen'l Corp. v. 20 Manchester Partners, L.P.*, 95 F.3d 1185, 1196 (3d Cir. 1996); *Moss v. Princip*, 913 F.3d 508, 520–21 (5th Cir. 2019)." Wagstaffe Prac Guide: Fed Civil Proc Before Trial § 15-IV (2023).

4.    On August 27, 2020 the Company sought a loan amount adjustment, later established to be consistent with the terms of the loan agreement[2] and agency policy[3] following the agency's request for and the Company's production of a tax return certifying the Company's 2019 expenses, where expenses served as the basis for the agency's determination of loan amount,[4] thereby establishing the need, and furthermore establishing the reason this information was not available at the time of the loan application due to a later in time tax filing authorization[5] in a disaster year among other factors where the Company included its 2020 amortization expense for the section 197 intangible assets listed on Form 4562 as 2019 expenses under 26 CFR § 1.165—11: "Election to take disaster loss deduction for preceding year" in its 2019 tax filing.

5.    The agency withdrew the loan amount adjustment first by reasoning "Unverifiable Information" stating in part that "we have withdrawn your application from active consideration because … the Internal Revenue Service (IRS) "reported "no record found" for a filing of a tax return by Pricecheck Inc. for the year(s) 2019... ." Further, providing instructions to overcome "decline/withdrawal" including specifically to obtain documentation from the IRS to resolve the discrepancy.[6] The letter dated

2    Petition Appendix at 7 [SBA Loan Agreement at 3: " Borrower will make any request for a loan increase for additional disaster-related damages as soon as possible after the need for a loan increase is discovered. The SBA will not consider a request for a loan increase received more than two (2) years from the date of loan approval unless, in the sole discretion of the SBA, there are extraordinary and unforeseeable circumstances beyond the control of the borrower."].

3    13 CFR § 123.19 (Cited May 22, 2020).

4    Petition Appendix at 4 [SBA Correspondence: "Please verify for me the total expenses … the 12 months prior to the disaster."]

5    Petition Appendix at 779 [26 CFR § 1.165—11 "The due date for making the section 165(i) election is six months after the due date for filing the taxpayer's Federal income tax return for the disaster year."]

6    Petition Appendix at 817.

January 14, 2020 was however transmitted by email January 28, 2020[7] despite the Company having worked with SBA closely throughout this interim of ongoing active consideration involving a number of phone calls and email correspondence[8], and further, by following SBA's instructions during that interim which included contact with IRS in-person and by phone where the IRS confirmed the record[9] on or before January 25, 2020.[10]

6.    In response, the Company wrote and sent a letter on February 2, 2021 which noted the discrepancy concerning the date of SBA's letter itself, and requested reconsideration by way of review of materials that contain all the significant information that would overcome the reason(s) for decline/withdrawal, considering the present availability of the IRS record.[11] Also noting "any change in law since our original request date is without retroactive effect, especially considering the possibility of changes in loan amount calculation methodology and the resultant impact on our ongoing reliance here."[12]

7.    On March 12, 2021 the Company contacted President Biden.[13] On December 10, 2021 President Biden replied.[14] On December 30, 2021 the Company again sought a loan amount adjustment and included a quote from President Biden's

_____

7  Petition Appendix at 816.
8  Petition Appendix at 819-824.
9  Petition Appendix at 766-777.
10 Petition Appendix at 820.
11 Petition Appendix at 812.
12 *Id*.
13 Petition Appendix at 334.
14 Petition Appendix at 333.

letter.[15] On March 17, 2022 the Company received an email stating in part "we have determined that your file should be reactivated for further consideration. … it may be several weeks before you receive a response from a processing Loan Officer."[16] On March 18, 2022, just after midnight, the Company received a letter stating in part, "you are not eligible for a larger loan amount."[17] On September 15, 2022, the Company contacted SBA and the Administrator, again seeking a loan amount adjustment.[18] Later that same day, the Company received a reply stating in part: "You are receiving this message as a notification that SBA is no longer accepting COVID-19 EIDL increase requests or requests for reconsideration of previously declined COVID-19 EIDL Loan or increase requests."[19]

8.     On December 17, 2022 Defendant/Third-Party Plaintiff contacted Congress and included a draft of a Supreme Court Petition for writ of mandamus, later filed March 14, 2023 (hereinafter "Petition"), with its associated appendix (hereinafter "Petition Appendix"), both incorporated by reference here.[20] Congress subsequently passed the *Protecting American Intellectual Property Act of 2022*, in the Senate on December 20, 2022, and in the House December 22, 2022.

---

15 Petition Appendix at 850.
16 EXHIBIT 1.
17 Petition Appendix at 1.
18 Petition Appendix at 913.
19 Petition Appendix at 997.
20 *In Re Jordan Powell*, 22-7044 (2023): Available at https://www.supremecourt.gov/search.aspx?filename=%2Fdocket%2Fdocketfiles%2Fhtml%2Fpublic%2F22-7044.html or www.TinyURL.com/SupremeCourtPetition Appendix Available at: https://acrobat.adobe.com/id/urn:aaid:sc:VA6C2:775121a8-eda7-4fd4-8375-3ac177a9335b or www.TinyURL.com/PetitionAppendix.

9.    On December 23, 2022 the Defendant/Third-Party Plaintiff forwarded its message to Congress including the draft petition to SBA.[21] On December 30, 2022 SBA emailed the Company stating "[w]e received your identity theft complaint" and requesting "[a]n executed and fully completed Declaration of Identity Theft, SBA Form 3513," a law enforcement report, and a valid identification.[22] On January 19, 2023 the Company provided the information requested.[23]   On January 23, 2023 SBA responded noting in part: "Section D is incomplete."[24]   Later that day the company replied in-part "the nature and circumstances regarding this particular complaint, makes the form, in particular, the unchecked boxes of section D incomplete-able" because it requires an affirmation that we received no loan proceeds whatsoever when the concern was with our not having received all of the eligible proceeds, and our loan data not being reported on USASpending.gov as required by the Data Act.[25] In addition, the Company requested a form suitable for the circumstances or in the alternative, a waiver for use of the form as is without checking boxes that as is would have been false statements. We also requested a response "as soon as possible including your name and title."[26] SBA did not reply.

10.    The Petition to the Supreme Court was docketed March 21, 2023 with a response due date of April 20, 2023. The Government failed to respond. The Petition

---

21 Petition Appendix at 998.
22 Petition Appendix at 1001.
23 Petition Appendix at 1002-1008.
24 Petition Appendix at 1009.
25 Petition Appendix at 24.
26 Petition Appendix at 1009.

was subsequently denied. However, in the interim, on April 14, 2023 the Court decided a case involving intellectual property rights where: "The Court … equat[es] mere Government benefits and entitlements with core private rights. See, *e.g.*, *Goldberg* v. *Kelly*, 397 U. S. 254, 261-263, 90 S. Ct. 1011, 25 L. Ed. 2D 287 (1970) (holding that due process rights attach to the deprivation of Government benefits)."[27]

11.    The Company notified SBA of its intention to file suit on November 23, 2023[28] having determined the loan amount increase as a core private right that was unlawfully withdrawn/declined where its subsequent increase reconsideration request on February 2, 2021 was never replied to, its March 17, 2022 reactivation was summarily denied, its mandamus Petition was not responded to, and SBA's implied reasoning of identity theft by requesting an official identity theft complaint after pre-filing notice was never followed up on.   On November 27, 2023 however, SBA replied again to our increase reconsideration initiated in August 2020, by stating "SBA is no longer accepting … requests for reconsideration of previously declined … increase requests."[29] This final decision on the initial and longstanding increase reconsideration, having also been provided notice of many binding provisions of law here,   surely constitutes final action by the agency and makes this claim ripe for judicial review.

12.    "To determine whether an action is committed to agency discretion courts consider "both the nature of the administrative action at issue and the language and

---

27 *Axon Enter. v. FTC*, 143 S. Ct. 890, 909 (2023).
28 EXHIBIT 2 [Email to SBA (November 23, 2023)].
29 EXHIBIT 3 Email from SBA (November 27, 2023).]

structure of the statute that supplies the applicable legal standards for reviewing that action."*Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156, 373 U.S. App. D.C. 1 (D.C. Cir. 2006)." See *Am. Petroleum Tankers Parent, LLC v. United States*, 943 F. Supp. 2D 59, 66. The Cares Act was codified in-part under 15 U.S.C. § 636(b)(2) providing the addition of a subsection regarding an emergency involving Federal primary responsibility where such addition is further provided with a requirement to accept applications for disaster assistance from eligible entities as seen here by the operative word "shall" as opposed to "may" which would otherwise grant the agency with discretion beyond a mere determination of eligibility. Here, "[t]he discretion of the [Administrator] is limited to deciding whether these requirements have been met. Judicial review of the [Administrator's] decision in this matter is available, since it would be anomalous … to lose rights, the conferring of which is made mandatory by the applicable statute.... " See *Ferry v. Udall*, 336 F.2d 706, 712-713 (9ᵗʰ Cir. 1964).

13.    Moreover, as previously codified in the notes to 15 U.S.C. 631(a): "(1) For fiscal year 2000 and each fiscal year thereafter … (2) the Administrator shall enter into commitments for direct loans and to guarantee loans … in the full amounts provided by law subject only to (A) the availability of qualified applications, and (B) limitations contained in appropriation Acts. Nothing in this paragraph authorizes the Administration to reduce or limit its authority to enter into such commitments." The Cares Act appropriation set no loan amount limitation below $2,000,000 as codified in 15 U.S.C. 636(b) nor provided the agency with any such discretion regarding full amounts below

that $2 million limit set in 636(b)(8)[30] where Administrator discretion begins above this amount more broadly for economic injury disaster loans as evidenced by the absence of a loan amount limitation in Subpart D of 13 CFR Part 123 as it stood in May 2020 in juxtaposition of Subpart C regarding physical disaster loans where the loan amount limit is conditioned in §123.202. In this subsection of Subpart C, the heading refers precisely to and only to physical disaster loans. Subsection (a) of this subpart limits physical disaster loan amounts as follows: "Disaster business loans, including both physical disaster and economic injury loans to the same borrower, together with its affiliates, cannot exceed the lesser of the uncompensated physical loss and economic injury or $2 million." This subsection concerning only physical disaster loans and their specific limitation to the lesser of, the combined total economic and physical injury, or $2 million, for businesses in physical disaster areas concerns only physical disaster loans for businesses requiring repairs and financial support during relatively brief operational impacts as compared to economic injuries appropriated for in the Cares Act where no above limit conditions were reset by Congress, or the Administrator in Subpart D.

14.    However, previously,[31] Congress did set a variable limitation concerning the amount subsidized based on the interest rate differential where the difference between the market rate and the guaranteed interest rate of not more than 4%[32] plus the "modeled risk of the recipient"[33] shall not exceed $500,000 "outstanding and committed … unless

---

30 PUBLIC LAW 110–246—JUNE 18, 2008.
31 PUBLIC LAW 98–270—APR. 18, 1984.
32 15 U.S.C. 636(d)(5)(C).
33 From USASpending.gov hover over *Loan Face Value*:
    "From a budget perspective, loan face value is not considered Federal spending, since it does not in itself represent

an applicant constitutes a major source of employment." See 15 U.S.C. 636(d)(6). This limit represents the amount awarded in contrast with the face value of the loan. For example, American Professionals Inc. received an EIDL loan with a face value of $2,000,000 and an award amount of $222,400.[34] Effectively, the Administrator codified conditions of discretion above the cap for physical disasters in Subpart C of 13 CFR Part 123, and left above cap discretion more broadly for economic disasters subject only to the conditions established by Congress in 15 U.S.C. 636(b)(8) and (d)(6).

15.    Here, when seeking a loan adjustment, the eligibility requirements had already been met.  SBA's policy to extend EIDL loan offers according to six months of expenses[35] had already been established by the initial request for information (12 months of expenses) and the loan amount received by the Company, which reflected precisely half the annual expense amount reported. Accordingly, making the adjustment consistent with statute and agency policy would be to make the adjustment by extending a loan

---

a long-term cost to the government. As a result, loan face value dollars <u>are not</u> included in the Total Awarded Amount figure above or any other part of this page where dollar amounts appear.What is included from a loan perspective in Total Awarded Amount and the other dollar figures is the loan subsidy cost, which is considered actual budgetary federal spending. Subsidy cost is the calculated net present value of the loan or loan guarantee to the government, taking into account the size of the loan (face value), interest rate, and the modeled risk of the recipient failing to pay back the loan in part or full; subsidy cost can be positive (indicating that the government is likely to lose money on the loan) or negative (indicating that the government is likely to make money on the loan). Subsidy cost should never be larger in absolute value terms than the face value itself. Administrative costs of running the loan or loan guarantee program itself are excluded from subsidy cost calculations.As stated above, all subsidy costs associated with loans this recipient has received during the filtered time period are captured within the "Total Awarded Amount" number above and anywhere else on this page dollar amounts are mentioned."

34 American Professionals Inc., Recipient Profile, Total Awarded Amount, Face Value of Loans, Awarding Agency: Small Business Administration (SBA), Disaster Assistance Loan(s) (For Economic Injury), (June 8, 2020) https://www.usaspending.gov/recipient/5f4566d9-4e20-f133-0c57-1667b7f432a3-R/all.

35 "SBA used different information to determine economic injury for agricultural enterprises and nonprofits. SBA asked these applicants to provide operating expenses for the 12 months prior to the disaster. To calculate 6 months of economic injury, SBA divided the 12-month operating expenses by two." See, GAO-21-589 Economic Injury Disaster Loan Program, at 7 (July 2021).

offer amounting to half the adjusted annual expense amount, at least subject to the limit, however, the agency failed to do so here. "An agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so. *See National Association of Broadcasters v. FCC,* 239 U.S. App. D.C. 87, 740 F.2d 1190, 1201 (D.C. Cir. 1984) (stating that the agency could not depart from its conclusion in a prior decision without reasoned explanation)." See *Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258. The reasoning provided by the agency was a "no record found" report by IRS.

16.    Section 1110 of the Cares Act states in relevant part(s):

"(c) TERMS; CREDIT ELSEWHERE.—With respect to a loan made under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)) in response to COVID–19 during the covered period, the Administrator shall waive— (1) any rules related the personal guarantee on advances and loans of not more than $200,000 during the covered period for all applicants … (3) the requirement in the flush matter following subparagraph (E) of section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)), as so redesignated by subsection (f) of this section, that an applicant be unable to obtain credit elsewhere.

(d) APPROVAL AND ABILITY TO REPAY FOR SMALL DOLLAR LOANS.—With respect to a loan made under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2) in response to COVID—19 during the covered period, the Administrator may —(1) approve an applicant based solely on the credit score of the applicant and shall not require an applicant to submit a tax return or a tax return transcript for such approval; or (2) use alternative appropriate methods to determine an applicant's ability to repay. …

(e) EMERGENCY GRANT.— (1) IN GENERAL.—During the covered period, an entity included for eligibility in subsection (b), including small business concerns, private nonprofit organizations, and small agricultural cooperatives, that applies for a loan under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)) in response to COVID–19 may request that the Administrator provide an advance that is, subject to paragraph (3), in the amount requested by such applicant to such applicant within 3 days after the Administrator receives an application from such applicant. … (5) REPAYMENT.—An applicant shall not be required to repay any amounts of an advance provided under this subsection, even if subsequently denied a loan under section 7(b)(2) of the Small Business Act (15 U.S.C. 636(b)(2)).

(f)  EMERGENCIES INVOLVING FEDERAL PRIMARY RESPONSIBILITY QUALIFYING FOR SBA ASSISTANCE.—Section 7(b)(2) of the Small Business Act

(15 U.S.C. 636(b)(2)) is amended—"

17.    Where 15 U.S.C. 636(b)(2) as amended by the Act provides in part:

"to make such loans (either directly or in cooperation with banks or other lending institutions through agreements to participate on an immediate or deferred (guaranteed) basis) as the Administration may determine to be necessary or appropriate to any small business concern, private nonprofit organization, or small agricultural cooperative located in an area affected by a disaster[,] (including drought), with respect to both farm-related and nonfarm-related small business concerns, if the Administration determines that the concern, the organization, or the cooperative has suffered a substantial economic injury as a result of such disaster and if such disaster constitutes …(D) an emergency involving Federal primary responsibility determined to exist by the President under the section 5191(b) of title 42; … (E) … *Provided*, That no loan or guarantee shall be extended pursuant to this paragraph (2) unless the Administration finds that the applicant is not able to obtain credit elsewhere: *Provided further*, That for purposes of subparagraph (D), the Administrator shall deem that such an emergency affects each State or subdivision thereof (including counties), and that each State or subdivision has sufficient economic damage to small business concerns to qualify for assistance under this paragraph and the Administrator shall accept applications for such assistance immediately."

18.    It follows logically that the agency applied Section 1110(c) of the Cares Act in the original loan approval as opposed to Section 1110(d) because 13 CFR § 123.11 determines loans larger than $25,000 require collateral and since the initial approval was greater than $25,000 and required collateral it would be illogical to consider it a "small dollar loan" subject to the provisions of 1110(d). Accordingly, Section 1110(c) logically controls for the original loan approval. Moreover, the loan adjustment increase necessity to the limit is certainly controlled by 1110(c) considering paragraph (1) waives the personal guarantee aspect of collateral for loans between $25,000 and $200,000 meaning that if loans less than $200,000 are not small dollar loans and thus controlled by 1110(c) then loans above that amount certainly are also, and are each controlled more particularly by the word "shall." Furthermore, it becomes clear that the provisions in

subsection (c), (d), and (e) operate independently in respect of their dollar amounts and their eligibility criteria despite each referring to loans under 15 U.S.C. § 636(b)(2). For instance, for each, the ability to repay follows different paths to determination: (d) provides the administrator discretion based solely on credit score but disallowing tax transcripts, or alternative methods; (e) does not require the applicant to repay any amount; and since (c) is silent on ability to repay, we turn to the operative provisions on repayment existing in the statute under 15 U.S.C. 636(b)(11) which provides "(11) INCREASING TRANSPARENCY IN LOAN APPROVALS.— The Administrator shall establish and implement clear, written policies and procedures for analyzing the ability of a loan applicant to repay a loan made under this subsection." Accordingly, we turn to the regulation where the Administrator carried out this mandate, found here, in 13 CFR § 123.6 which provides in relevant part:

> "There must be reasonable assurance that you can repay your loan based on SBA's analysis of your credit or your personal or business cash flow, and you must also have satisfactory character. SBA will not make a loan to you if repayment depends upon the sale of collateral through foreclosure or any other disposition of assets owned by you."

Here, the Cares Act appropriation removes agency discretion from this regulation concerning its option to analyze personal or business cash flow by way of tax transcripts by use of the word shall in Section 1110(c) , leaving only credit analysis and self reported information available to determine the ability to repay because of the appropriations' command to do so "immediately."

19.    The President determined an emergency involving Federal primary

responsibility under 5191(b) of title 42, leaving the agency with no discretion concerning this dispute.[36] "To determine whether an action is committed to agency discretion courts consider "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156, 373 U.S. App. D.C. 1 (D.C. Cir. 2006)" See *Am. Petroleum Tankers Parent, LLC v. United States*, 943 F. Supp. 2D 59, 66. Taken together with existing sections of the Small Business Act, this declaration thereby makes Congress' mandate to the Administration crystal clear:

> "The administration also is empowered[37]... to make such loans [and,][38] …the administrator **SHALL** deem that such an emergency affects each state … and that each state or subdivision has sufficient economic damage to small business concerns to qualify for assistance under this paragraph and the administrator **SHALL** accept applications for such assistance immediately ."[39] Furthermore, "the administrator **SHALL** enter into commitments for direct loans and to guarantee loans … in the full amounts provided by law subject only to (a) the availability of qualified applications, and (b) limitations contained in appropriation acts. Nothing … authorizes the administration to reduce or limit its authority to enter into such commitments."[40] (*Emphasis added*).

 "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement. And here, the repeated 'shall ...' clearly means what it says." See *Biden v.*

---

36 "On March 13, 2020, President Donald J. Trump declared an emergency under Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act; 42 U.S.C. §5191(b)) in response to coronavirus disease 2019 (COVID-19). ... "Letter from Donald J. Trump, President of the United States, to Acting Secretary Wolf, Secretary Mnuchin, Secretary Azar, and Administrator Gaynor, March 13, 2020, https://www.whitehouse.gov/wp-content/uploads/2020/03/ LetterFromThePresident.pdf (hereinafter President Trump, "Emergency Declaration Letter"). The Stafford Act may be found at 42 U.S.C. §§5121 et seq"). Stafford Act Declarations for COVID—19 FAQ, Congressional Research Service (April 22, 2020).
37 15 U.S.C. 636(b).
38 15 U.S.C. 636(b)(2).
39 15 U.S.C. 636(b)(2)(E).
40 15 U.S.C. 631(a)(2).

*Texas*, 142 S. Ct. 2528, 2554 (2023).

20.    As to "immediately," immediacy requires the removal of any impediment to action where the requirement of tax transcripts for personal or business cash flow would be such an impediment. Until December 27, 2020, this was agency policy, as confirmed by the Government Accountability Office's (GAO) statutory interpretation in its EIDL program table of key provisions and changes where the Cares Act "[r]estricted SBA from obtaining federal tax transcripts as part of the EIDL application process." Moreover, the agency makes no objection to this in their response letter to the GAO, so any deference typically afforded to the agency regarding their interpretation of the statute in any way alternative to this has already been exhausted by acknowledgement and through policy, apparently including loans above $200,000 as seen in many, many instances (where only self reported personal guarantees could have satisfied the statute's immediacy requirement if the agency exercised the Section 1110(c)(1) provision to make "any" such requests for loans over $200,000 under 13 CFR §123.11(c) as perhaps they may have). For example, Datamation Systems was awarded a loan with a $500,000 face value on June 8, 2020.[41] Similarly, the Company's initial loan was approved based on self reported information to satisfy the statute's immediacy requirement.

21.    The original loan approval is evidence that the Company met the eligibility requirements of the loan guarantee. Its loan amount adjustment necessity notification to

---

41 Datamation Systems, Award Profile, Loan Summary, Awarding Agency: Small Business Administration (SBA), Disaster Assistance Loan (For Economic Injury), (June 8, 2020) https://www.usaspending.gov/award/ASST_NON_9122357810_7300.

SBA upon discovery of the essential need (based on events beyond its control, occurring after SBA approved its original loan, and related to the disaster for which the original EIDL loan was made) required SBA to increase the loan amount based on the expenses reported, and even if the agency did request a self reported personal guarantee it would have been provided then as it was later in another instance that is also part of the agency record.[42] The Section 1110(c) loan guarantee included eligibility requirements and a mandate to accept applications for assistance immediately where agency policy was to issue loan amounts based on six months of expenses. Similarly, an adjustment under Section 1110(c) requires mere eligibility requirements and mandate application acceptance immediately for a guaranteed loan increase in the amount consistent with agency policy for which the original appropriations were made. "[T]he Administrator's decision on an application for a loan guarantee is not committed to agency discretion and is thus reviewable by the Court." See *Am. Petroleum Tankers Parent, LLC v. United States*, 943 F. Supp. 2D 59, 61 (2013). (See also "[t]hus, the agency's decision is not unreviewable simply because it concerns a loan guarantee... . *Robbins v. Reagan*, 780 F.2d 37, 48, 250 U.S. App. D.C. 375 (D.C. Cir. 1985)." *Id*. at 67).

22.    An existing SBA policy set out in 1998 appears to have been the guidepost for determining an eligibility recertification for loan increases within the scope of 1110(c) as set out in 13 CFR § 123.19:

"SBA will consider your request for an increase in the loan amount if you can show that

---

42 EXHIBIT 4 [Self reported personal income statement | Agency acknowledgement].

the increase is essential for your business to continue and is based on events occurring after SBA approved your original loan which were beyond your control. For example, delays may have occurred beyond your control which prevent you from resuming your normal business activity in a reasonable time frame. Your request for an increase in the loan amount must be related to the disaster for which the SBA economic injury disaster loan was originally made."

23.    However, only one sentence of the regulation for a loan amount increase adjustment fits flawlessly within the reapplication scope of the statute under 1110(c). "Your request for an increase in the loan amount must be related to the disaster for which the SBA economic injury disaster loan was originally made." The others, although satisfied here by the documents, letters, and email communications available in the agency record, are beyond the scope of the statute and appropriations provided for in this particular economic injury disaster. Even if the scope of the statute did include the full extent of the policy provided in § 123.19 "[t]he discretion of the [agency] is limited to deciding whether these requirements have been met." See *Ferry v. Udall*, 336 F.2d 706, 712-713 (9th Cir. 1964). "The analytical problem is that of determining when the agency action is 'committed to agency discretion' within the meaning of ... the Administrative Procedure Act, and when it merely 'involves' discretion which is nevertheless reviewable." *Id.* at 711.  In a similar case, "[t]he Supreme Court held that [certain] statutes constituted an offer ..., the compliance with which became mandatory once [they] accepted the offer in accordance with the statutes. The discretion of the [agency] was limited solely to determining whether the statutory conditions had been met. The Court decided that the Secretary had erred in attempting to cancel the selections, and affirmed a district court decision favorable to the state's claim of title."

*Id.* at 713. "Moreover, [such] injury is capable of being redressed by court order... ." See *XP Vehicles, Inc. v. DOE*, 118 F. Supp. 3D 38, 64 (2015).

24.    "The Court … equat[es] mere Government benefits and entitlements with core private rights. See, *e.g.*, *Goldberg* v. *Kelly*, 397 U. S. 254, 261-263, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970) (holding that due process rights attach to the deprivation of Government benefits).  *Axon Enter. v. FTC*, 143 S. Ct. 890, 909 (2023).  "Judicial review of the [agency's] decision in this matter is available, since it would be anomalous to allow [one] to lose rights, the conferring of which is made mandatory by the applicable statute, merely because authorized personnel in the [agency] made erroneous or arbitrary decisions... .See *Adams v. Witmer*, 9 Cir., 271 F.2d 29, 34." See *Ferry v. Udall*, 336 F.2d 706, 712-713 (9th Cir. 1964).

25.    This court previously held "[t]he fact that the Administrator is not by statute commanded to guarantee all eligible obligations does not preclude this Court from reviewing the Administrator's decision to deny an application for a loan guarantee." *Am. Petroleum Tankers Parent, LLC v. United States*, 943 F. Supp. 2D 59, 68. Thereby, it becomes immediately clear here where statute commands the guarantee of all eligible obligations, that this court is not precluded from review here either. "The Supreme Court has made it clear that "*Chevron* deference does not apply where the statute is clear." *Johnson v. Guzman Chavez*, 594 U.S., 141 S. Ct. 2271, 2291 n.9, 210 L. Ed. 2d 656 (2021); *see also Babb v. Wilkie*, 589 U.S., 140 S. Ct. 1168, 1177, 206 L. Ed. 2d 432 (2020) ("[W]here, as here, the words of [a] statute are unambiguous, the judicial inquiry

is complete." *Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 121.

26.     As to the provisions of law and the appropriations available under the Cares

Act, such provisions and amounts were altered on December 27, 2020 pursuant to the

*Consolidated Appropriations Act of 2021*.[43] This and a number of other statues would

later improperly effect the Company's rights concerning a loan increase.  For instance,

this Act "[r]emoved [a]restriction that SBA cannot obtain federal tax transcripts as part

of the EIDL application process. In addition, SBA made unspoken policy changes

contrary to statute.[44] However, even "[s]tatutes are disfavored as retroactive when their

application "would impair rights a party possessed when he acted... ." See *Fernandez-

Vargas v. Gonzales*, 548 U.S. 30, 33. Moreover:

> "A statute is not given retroactive effect "unless such construction is required by explicit
> language or by necessary implication." *United States* v. *St. Louis, S. F. & T. R. Co.,* 270
> U.S. 1, 3, 46 S. Ct. 182, 70 L. Ed. 435, 62 Ct. Cl. 748[.] In determining whether a statute
> has an impermissibly retroactive effect, the Court first looks to "whether Congress has
> expressly prescribed the statute's proper reach," *Landgraf, supra,* at 280, and in the
> absence of express language tries to draw a comparably firm conclusion about the

---

43 PUBLIC LAW 116–260—DEC. 27, 2020 134 STAT. 2019 "(c) RESCISSION.—With respect to
unobligated balances under the heading ''Small Business Administration—Business Loans Program
Account, CARES Act'' as of the day before the date of enactment of this Act, $146,500,000,000
shall be rescinded and deposited into the general fund of the Treasury."

44 "SBA lowered the maximum EIDL loan amount to $150,000 beginning on May 4, 2020. However,
SBA did not provide this information on its website, in its press releases, or within the EIDL
application. The first time SBA broadly announced the $150,000 loan maximum was in February
2021 when it updated its FAQ document. Prior versions of the FAQ stated that the maximum loan
amount was 6 months of working capital and did not specify a maximum amount. … SBA also did
not provide other key information to help applicants estimate their potential loan amount.
Specifically, the EIDL application form requests that applicants provide the dollar amounts for 12
months of gross revenues and cost of goods sold. These amounts are part of the calculation SBA
uses to determine an applicant's economic injury and ultimately the loan amount SBA could offer
the applicant. … In February 2021, 11 months after the CARES Act revised the EIDL program in
response to COVID-19, SBA defined "cost of goods sold" in its updated FAQ and provided a link to
an Internal Revenue Service website for further information. However, the link takes the applicant
to a webpage with over 30 links on a variety of topics, none of which are labeled "cost of goods
sold." GAO-21-589 Economic Injury Disaster Loan Program, at 21-22 (July 2021).

> temporal reach specifically intended by applying its "normal rules of construction," *Lindh* v. *Murphy,* 521 U.S. 320, 326, 117 S. Ct. 2059, 138 L. Ed. 2d 481. If that effort fails, the Court asks whether applying the statute to the person objecting would have a retroactive effect in the disfavored sense of "affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment," *Landgraf, supra,* at 278. If the answer is yes, the Court then applies the presumption against retroactivity by construing the statute as inapplicable to the event or act in question. *INS* v. *St. Cyr,* 533 U.S. 289, 316, 121 S. Ct. 2271, 150 L. Ed. 2d 347. Pp. 5-6." *Id.*

Accordingly, the Company's February 2, 2021 objection to the retroactive effect of the statute shall construe the statute as inapplicable to the loan increase and thereby makes available the loan increase according to six-months of expenses as determined by its tax record when sufficient appropriations remained available to carry out the provisions of the Cares Act as it stood when the original loan application was made by the Company and once seeking a loan amount adjustment. While "[o]n February 4, 2021, SBA added detailed information about the loan limits … SBA has [since] continued a practice of being open and transparent about the loan limit and the Agency's commitment to offer further increases up to the full statutory limit of $2 million for eligible businesses."[45]

27.    Nevertheless, SBA's explanation for "withdrawal/decline" of the increase that the IRS reported "no record found" regarding the Company's 2019 tax record turned on one of two factors: (1) the agency had knowledge of the record and backdated the decision to a date prior to that despite ongoing active consideration and communication or, (2) the agency had no knowledge of the record considering the Company's communication with the IRS on or about January 25, 2020 that the record had been

---

[45] *Id*. at 88 (GAO Report reply letter from Mr. James Rivera, Associate Administrator, Office of Disaster Assistance, U.S. Small Business Administration to Mr. Bill Shear, Director, Financial Markets and Community Investment, U.S. Government Accountability Office (July 19, 2021)).

found but not yet posted and moreover it had been inadvertently designated as a fiscal year 2020 return as opposed to 2019 despite the Company's filing was made for 2019 on an IRS form 1120 for 2019 which contains **2019 IN BOLD** large font in the upper right hand corner of the form and SBA had received a copy of the return directly from the Company as well.

28.    Section 1110(c) of the Cares Act left the SBA with no discretion (granted mere eligibility criteria and applicable disaster determination) where policy already determined the loan amount calculation. Even if that policy somehow reached the agency's discretion regarding a personal guarantee under 1110(c)(1) *vis-a-vis* 636(b)(11) *vis-a-vis* § 123.11, they did not request one. Moreover, even after the reconsideration reactivation there was information on the agency disaster record for the borrower showing deferred personal compensation nearly twice the principal and interest repayment amount of a $2,000,000 loan where this compensation expense of the Company is to become current as personal income concerning the personal guarantee where also § 123.11(d) provides "SBA will not decline a loan if you lack a particular amount of collateral as long as it is reasonably sure that you can repay your loan" meaning the discretion from § 636(b)(11) transformed into binding and controlling terms once transcribed and published in § 123.11 including however amended before the loan application was made because of the "shall" requirement of § 636(b)(11). The fact the Company and its executive's collateral where the executive's cash flow nearly twice exceeds the monthly principal and interest payments of the Company's loan, makes it

evident that the executive "can" make loan payments if ever the Company could not where also its collateral has a history of market value, involving outside investors, leading back seven years to 2016 when secure agreements for future equity were made at a $10,000,000 valuation cap that far exceeds the loan amount whereas asset value in our 2019 tax record is substantially higher than the cap. Furthermore, this regulation does not even require "a particular amount of collateral." Effectively, if there is any discretion involved regarding a such a threshold question, the Company and executive in this case exceeds that threshold so far that these are purely eligibility determinations where one number is compared to another where both exceed the repayment amounts monthly and in total (executive income and total asset value in real market terms) where the threshold for ability to repay, mandated by Congress to be written, was set below the bright-line ability to repay that the Company and the executive clearly exceed, and so denial for completely unrelated and unlawful reasons is beyond unreasonable. Meanwhile, "under the APA, ... exercise of discretion within that statutory framework must be reasonable and reasonably explained. See *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 103 S. Ct. 2856, 77 L. Ed. 2D 443 (1983)." See *Biden v. Texas*, 142 S. Ct. 2528, 2543-2544. Here, backdating a loan decision or depending on an obvious mistake from another agency regarding the tax year, while having all the information to determine the most apparent truth of the matter (that the return was for 2019 and not 2020), is both unreasonable and unexplainable. Furthermore, in the reconsideration reactivation stating the maximum was reached by

applying regulations and statutes that did not exist when the loan was made and is still untrue even if they did apply, is not genuine. "The reasoned explanation requirement of administrative law is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. The explanation provided here was more of a distraction." See *DOC v. New York*, 139 S. Ct. 2551, 2559. "In order to permit meaningful judicial review, an agency must " 'disclose the basis' " of its action. *Burlington Truck Lines*, *Inc.* v. *United States*, 371 U. S. 156, 167-169, 83 S. Ct. 239, 9 L. Ed. 2d 207. A court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record, *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council*, *Inc.*, 435 U. S. 519, 98 S. Ct. 1197, 55 L. Ed. 2d 460, but it may inquire into "the mental processes of administrative decisionmakers" upon a "strong showing of bad faith or improper behavior," *Overton Park*, 401 U. S., at 420." *Id.* Several points, considered together, reveal a significant mismatch between the decision the Secretary made and the rationale he provided." *Id* at 2575. "[T]he role of courts in reviewing arbitrary and capricious challenges is to "simply ensur[e] that the agency has acted within a zone of reasonableness." *FCC* v. *Prometheus Radio Project*, 592 U. S. ___, ___, 141 S. Ct. 1150, 209 L. Ed. 2D 287, 294 (2021)." *Biden v. Missouri,* 142 S. Ct. 647, 654 (2023). Nevertheless, it is the Defendant/Third-Party Plaintiff's contention here that the agency had no discretion to begin with, merely to consider like things alike when substituting one number for another regarding expenses, applying reported

numbers concerning collateral to mere threshold questions, and acting immediately in adjusting the loan amount according to the expenses reported by the borrower.

29.    If it becomes the agency's contention that the statute was silent in some way as to the specific and substantial nature of the reconsideration where amortization is a substantial expense in the Company's tax record even prior to being doubled by the provisions of 26 CFR § 1.165—11, it should first consider its own affirmation that amortization is an expense[46] and then consider legislative history where the legislative intent of Congress was to make sure small businesses that would not usually be able to access capital from these loan programs were able to here, and moreover due to the importance of innovation and that such would continue. For instance:

> THE GENTLEMAN FROM MARYLAND, MR. CARDIN: "So my role as the senior Democrat on the Small Business Committee, working with Senator RUBIO, the chairman of that committee, was to make sure that we had a robust provision to preserve the growth engine and innovation engine of our economy, and that is small businesses. There is more job growth for small companies, and there is more innovation for small companies. We need to preserve the ability of small companies to get through this time. … So we have to provide special attention to small businesses, and this package does that in a very, very robust way."[47]

> THE GENTLEMAN FROM SOUTH DAKOTA, MR. THUNE: "The only loser we know is the American people in all of this because the longer this goes on, the harder it becomes for them to get back to where they were, and the harder it becomes for that small business to stay open or keep those employees employed. Every single day is costing the American economy and American workers jobs, resources, and wages they could be putting forward to take care of them and their families."[48]

30.    Furthermore, a closer and more historic view of Congressional intent

---

[46] *Eagle Mill Supply, Inc.*, SBA No. SIZ-93-5-3-51 (June 22, 1993). (The SBA Office of Hearings and Appeals recognizes amortization as an expense: "Respecting analysis of the cost of manufacturing in the instant case, the Appellant lists its itemized costs, comprising a total of $5.54 (including $.90 per part as "Amortized Tool Cost"), the charge, per part, of Engineered Products of $1.20 (which we take to exclude the cost of materials, i.e., the plastic), resulting in a total cost of $6.74 per pan.").
[47] CONGRESSIONAL RECORD—SENATE at S2029-S2030 (March 25,2020).
[48] CONGRESSIONAL RECORD—SENATE at S2029-S2030 (March 24,2020).

supports the fact that Congress does not want the Small Business Administration to replace Congress' collective wisdom in statute with its own determinations or actions in policy outside the scope of statute. In circumstances following natural disasters during the first few months of the Reagan Administration in 1981 following the Carter Administration the SBA decided to reduce the amounts of disaster loans provided by statute because they hoped to preserve funds for a greater number of injured parties and Congress responded in turn with legislation, supported by legislative history that makes clear their intent. For instance:

> THE GENTLEMAN FROM OHIO, MR. SHAMANSKY: "Mr. Speaker, I want to bring to the attention of the House a serious problem concerning disaster relief. On March 19 of this year the Small Business Administration adopted without prior public discussion or notice—a regulation reducing the amount of disaster loan coverage. After that date the amount available to new applicants was reduced from 100 percent of variable loss to just 60 percent. SBA officials said claims caused by the unexpectedly large number of natural disasters which already had occurred this year exceeded the agency's cash reserves. Regardless of SBA's cash-flow situation—the result of the regulation is to hand the victims of disasters which happen after March 19 a double penalty. Not only must they struggle to rebuild, they learn that because "too many disasters" struck before theirs, less assistance is available to them."[49]

> THE GENTLEMAN FROM MARYLAND, MR. MITCHELL: "[W]e fell below the direct loan money that the committee had generally approved, which means that some businesses are not going to survive; others that have the potential to go into businesses will not get their chance. In addition to that, we had to sustain severe cuts in the disaster loan program. There was a time when this Congress and this Nation were compassionate with regard to those who were the victims of disaster..."[50]

> OMNIBUS BUDGET RECONCILIATION ACT OF 1981: 15 USC Note: "Sec. 1916. (a) Notwithstanding section 5(b)(6) of the Small Business Act, or any other provision of law, any business concern applicant for assistance made pursuant to paragraph (1), (2), or (4) of subsection 7(b) of the Small Business Act whose application was received but not approved by the Small Business Administration on or before March 19,1981, shall be offered loan assistance by the Small Business Administration as provided in this section. (b) The Small Business Administration is specifically directed to reconsider and act upon any such application and to make, remake, obligate, reobligate, commit or recommit such financing as provided herein." ... "(c)... . If the applicant was a business

---

49 CONGRESSIONAL RECORD—HOUSE at 14352 (June 26, 1981).
50 CONGRESSIONAL RECORD—HOUSE at 18965 (July 31, 1981).

concern unable to obtain credit elsewhere, or was an applicant under sections 7(b)(2) or 7(b)(4) of the Small Business Act, the terms and conditions shall be those in effect for such applicants on the date such application was first received."

31.    In the instance cited historically above, the Congress returned to the floors of the House and Senate to reflect their frustrations with the SBA when they had not acted according to their original mandate. They passed bicameral legislation that was signed into law by President Reagan on August 7, 1981, restoring full benefits to borrowers.[51] The volume of businesses effected in this instance were so great that it warranted an act of Congress to remedy this nationwide injury, where it would be nearly impossible for some to master the legislative and regulatory nuances of administrative procedure law in practice well enough to make a claim as a constitutional right under § 1331 while enduring a physical disaster. Here, in this anomalous instance of prolonged injury however, the statute was clear, the rights are protected by the Constitution, numerous other borrowers obtained the full loan amount, and redress from economic injury disaster is available here, in this court. Again, "judicial review of the Secretary's decision in this matter is available, since it would be anomalous to allow [one] to lose rights." *Ferry v. Udall*, 336 F.2d 706, 712-713 (9th Cir. 1964).

32.    As it is written, the intention of Congress was to appropriate loan guarantees in a "very, very robust way" to assure the continuance of "innovation" here in the United States. It would be opposite of the intent of Congress to deny the Company its full benefit where such effectively acts in favor of its anticompetitive Chinese competitor, Ant Group, as seen in the Petition, which was subsequently fined by the

---

51 OMNIBUS BUDGET RECONCILIATION ACT OF 1981 (August 7, 1981).

Chinese Security Regulatory Commission (CSRC) for violations of laws in its payment business.[52] Following the Petition and the fine by CSRC, Ant Group offered[53] and reportedly repurchased shares at a $78 billion valuation, a $237 billion reduction from its planned IPO valuation of $315 billion.[54] Nevertheless, the sizable amount of the loan guarantee appropriated for the Company by statute is not only a Constitutional right but also necessary for its survival since having been overlooked in Coronavirus response aid, on top of considering the size of Ant Group and its backers—ranging from the sovereign wealth fund of Saudi Arabia (PIF) to the Social Security Fund of China, and even a portfolio company of BHR Partners (GF Securities, through its subsidiaries, GF Fund Management Co. and E Fund)[55] which is 10% is owned by Skaneateles, a District of Columbia based LLC exclusively governed by the son of the President of the United States.[56] Ant Group was banned by President Trump January 5th 2021, and restored by President Biden June 10th 2021, after the SBA denied the Company of its Constitutional

---

52 EXHIBIT 5 [China Securities Regulatory Commission. Press Release. July 7, 2023].

53 EXHIBIT 6.

54 Julie Zhu and Josh Ye, Reuters, *Ant's Surprise Share Buyback Values Firm at Steep 75% Discount to IPO*, July 8, 2023, https://www.reuters.com/technology/ants-share-repurchase-plan-values-firm-nearly-79-bln-2023-07-08/. See also, https://www.reuters.com/technology/global-investors-skip-ants-buyback-after-valuation-slumps-70-bloomberg-news-2023-08-08/.

55 Ant Group Prospectus at 145, 150, 155, 401, and 404 (October 27, 2020), https://www1.hkexnews.hk/listedco/listconews/sehk/2020/1026/2020102600165.pdf.

56 EXHIBIT 7 [Robert Hunter Biden is listed as sole governor of the District of Columbia LLC, Skaneateles. While a manager is listed under a California legal address for the LLC in the 2023 restructuring agreement, no such entity is registered in the State of California at the time of last searching (October 30, 2023) and a manager appointment along with a "legal address" is no determination that the interest has been sold or even transferred. Moreover, despite the revocation of the entity and recently elapsed two-year re-registration period following its October 2021 registration,  this alone does not take or transfer title to the entity's interest in BHR Partners from the entity's sole governor where the 2023 agreement re-certified Mr. Biden's 10% interest.] Available in full here: https://www.scribd.com/document/641557660/Joint-Venture-Contract-en-0419-Final#fullscreen&from_embed.

right.[57] Accordingly, if SBA further denies the Company of this right we will seek extra-record discovery where the court may "inquire into "the mental processes of administrative decisionmakers" upon a "strong showing of bad faith or improper behavior," *Overton Park*, 401 U. S., at 420." See *DOC v. New York*, 139 S. Ct. 2551, 2559.

33.    In May 2023, Fox News reported a meeting between Hunter Biden and Ant Group founder Jack Ma in September 2016[58], two-weeks following the Company's non-disclosure agreement with E-Mart as extended to Samsung (which was in partnership with Alipay, an Ant Group Subsidiary).[59]   Skaneateles joined a joint-venture, now known as BHR Partners, with Harvest Fund on March 18, 2017.[60] The Company filed a provisional patent July 2017, Alibaba/Ant Group filed a patent application making many of the same claims in November 2017, approximately two-weeks after the Company's app was released on the Apple app store.[61] Ant Group raised $10.5 billion dollars at a $150 billion dollar valuation on May 16, 2018 including an investment from Sequoia, with whom we spent months building a relationship and seeking investment.[62] On June 12, 2018 the Chinese patent office granted Ant Group the patent[63] yet the Company, has preserved and retains priority to date and, has standing to invalidate.  On June 13, 2019

---

57 Petition at 17, 20.
58 Cameron Cawthorne and Jessica Chasmar, "*Hunter Biden wooed China execs with high-level CCP ties...*", Fox News, May 24, 2023 https://www.foxnews.com/politics/hunter-biden-wooed-china-execs-high-level-ccp-ties-while-fundraising-film-venture-dad-vp.
59 Petition at 6-7.
60 EXHIBIT 7.
61 Petition at 9.
62 *Id*. at 9-10.
63 Petition Appendix at 506.

the USPTO also granted this patent to Ant Group.[64] On December 8, 2019 President Biden stated in an interview with Axios concerning how his son's foreign business dealings might affect his prospective presidency to which he replied: "They will not be engaged in any foreign business because of what's happened in this administration. No one's gonna be seeking patents for things from China. No one's gonna be engaged in that kind of thing."[65] On September 20, 2020 BHR's portfolio company GF Securities through its subsidiaries, made a combined total of "strategic" investments and pre-IPO commitments to Ant Group of $578 million dollars.[66] Whereas attempted regulatory capture is at times a component of anticompetitive activity, the President has met with BHR Partner's managing director Jonathan Li in-person[67], the Company's letter to the President resulted in the unexpected resignation of Ant Group's CEO the same day[68], and the President having written a letter to the Company in response to its challenges with an EIDL loan[69]—the *Overton Park* inquiry, if necessary, may include President Biden in his capacity as Supervisor of the Administrator of the SBA.

## **PRAYER FOR RELIEF**

34.    Whereas no discretion was left to SBA concerning the appropriation of a loan guarantee to eligible entities as established here, where policy required the

---

64 *Id*. at 507.
65 Margaret Talev, *Biden promises restrictions on Hunter, family if elected*, December 8, 2019 https://www.axios.com/2019/12/08/joe-biden-hunter-family-restrictions-impeachment video at 01:46.
66 EXHIBIT 7.
67 "Joe Biden met with Jonathan Li in Beijing, China, had a phone call with him, and later wrote college recommendation letters for his children."See https://oversight.house.gov/release/comer-reveals-wires-from-china-have-joe-bidens-wilmington-home-as-the-beneficiary-address%EF%BF%BC/.
68 Petition at 18.
69 Petition Appendix at 333.

provision of a loan amount of six months expenses to the limit set by Congress at the time of the Company's original application and its increase application alongside the agency's requirement by law to treat like things alike, and where the available funds at the time of recision but after reapplication were $146.5 billion, and such recision, as to the availability of funds, is to be disfavored in this instance ("[s]tatutes are disfavored as retroactive when their application "would impair rights a party possessed when he acted... .") See *Fernandez-Vargas v. Gonzale*s, 548 U.S. 30, 33. We ask this court to for a declaratory judgement as well as injunctive relief ordering the agency to provide the full loan amount to the Company in the total amount of $2,000,000. Effectively, an additional $1,970,900.  Notably, these funds remain available[70] for budget reconciliation and disbursement pursuant to the five-year look back and look-forward of the budget reconciliation act.[71]  Accordingly, it is understood that the FY21 (Late Fall 2020) disbursement may be resolved by the SBA in coordination with the Office of Management and Budget (OMB) until FY26 (Fall 2025).

---

70 The November 15, 2021, Infrastructure Act designated certain remaining disaster loan funds as especially for emergency use under the PAYGO Act, where the amounts are held exclusively for emergency appropriations, unless otherwise appropriated by a supermajority. "DESIGNATION.— The amount rescinded pursuant to paragraph (1) that was previously designated by the Congress as an emergency requirement pursuant to section 251(b)(2)(A)(i) of the Balanced Budget and Emergency Deficit Control Act. See also, (Pub. L. 111–139, title I, §3, Feb. 12, 2010, 124 Stat. 8."

71 "If the applicant was a business concern unable to obtain credit elsewhere, or was an applicant under sections 7(b)(2) or 7(b)(4) of the Small Business Act, **the terms and conditions shall be those in effect for such applicants on the date such application was first received.**"

Date: November 11, 2024

Respectfully Submitted,

JORDAN POWELL, J.D.
1263 1ST STREET, SE, 523
WASHINGTON, D.C. 20003
(202) 503-5284 | JTTP@PM.ME